190 F.3d 768 (6th Cir. 1999)
 INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AND ITS LOCAL UNION NO. 540; RICHARD POLLARD; RONALD MANKE; THOMAS ELDON; ALLEN LAWRENCE, PLAINTIFFS-APPELLEES,
v.
BVR LIQUIDATING, INCORPORATED, FORMERLY KNOWN AS BEAVER PRECISION PRODUCTS, INC.; UNITRON, INC., DEFENDANTS-APPELLANTS.
 No. 99-1024
 U.S. Court of Appeals, Sixth Circuit
 Argued: August 13, 1999
Decided: September 14, 1999
 
 Appeal from the United States District Court for the Eastern District of Michigan at Ann Arbor. Nos. 97-60151; 97-60210--Barbara K. Hackett, District Judge.
 Michael F. Saggau (argued and briefed), Detroit, MI, for Plaintiffs-Appellees.
 Daniel G. Wyllie (briefed), Dykema Gossett PLLC, Detroit, MI; Robert J. Trizna (argued and briefed), Schuyler, Roche & Zwirner, Chicago, IL, for Defendants-Appellants.
 Before: Merritt, Kennedy, and Daughtrey, Circuit Judges.
 OPINION
 Kennedy, Circuit Judge.
 
 
 1
 Plaintiffs, Local No. 540, et al., filed suit against defendants BVR Liquidating, Inc. and Unitron, Inc. to enforce the provisions of the collective bargaining agreements ("CBA").[1] This suit arose out of the defendants' closure of its Troy, Michigan production plant. Although the plaintiffs raised many claims in the district court, this appeal concerns only one of these claims. Plaintiffs contend that retirees' rights to health care[2] benefits provided for in the insurance agreements have vested and that the defendants have violated the terms of the agreements by terminating these benefits. Defendants argue that the retiree health care benefits provided for in the insurance agreements are limited in duration to the term of the CBA.[3] Because defendants terminated the retiree health care benefits upon the expiration of the latest CBA, defendants state that they did not breach the terms of the agreement.
 
 
 2
 The district court found that the retirees' lifetime health care benefits had vested; thus, the plaintiffs were entitled to summary judgment on this issue. Defendants timely appealed.
 
 
 3
 Defendants raise one issue on their appeal of the district court's granting of summary judgment in favor of the plaintiffs: (1) whether the district court erred in finding that the plaintiffs were entitled to vested lifetime retiree health care benefits under the CBAs.
 
 I. Facts
 
 4
 This appeal concerns the interpretation of the CBAs and accompanying insurance agreements governing the workplace relationships between the union and the company[4] for the years between 1988 and 1997. Although there were three different CBAs in effect during this time-frame, both parties concede that the relevant provisions do not differ. Pursuant to these CBAs, the company and the union entered into separate insurance agreements that specified the insurance benefits provided to union members and retirees. The focus of this appeal is the health care benefits provisions of these insurance agreements.
 
 
 5
 Prior to 1988, the CBA provided lifetime health care benefits for individuals who retired between 1985 and 1988. In the negotiations for the 1988-1991 CBA, the parties made some significant changes to the insurance agreement by increasing the amount of paid-up life insurance by $1,000, by providing health care benefits for retirees' spouses and eligible dependents and by increasing coverage for all participants to include vision and hearing benefits. To effectuate these changes the parties redrafted the language of the benefits provision. As a result of this redrafting, the language, found in the 1985-1988 agreement, stating that the retirees' benefits continued until the date of death was not included in the paragraph providing for increased benefits for those who retired after July 1, 1988. The paragraph used the term "continued."[5] It is this change that is central to this appeal.
 
 
 6
 On April 7, 1997 the company sold essentially all of its assets, closed the Troy plant and terminated all of its employees.The company also informed the employees who had retired after June 30, 1988 that they would no longer receive the health care benefits to which they had been entitled under the CBAs and the insurance agreements. Plaintiffs filed suit against the defendants to enforce the provisions of the CBAs.
 
 
 7
 Plaintiffs argued that they were entitled to lifetime health care benefits because the rights had vested prior to the expiration of the contract. Plaintiffs stated that Section 9C of the agreement was unambiguous and that the language supported their interpretation of the provision. Because the provision stated that benefits continue plaintiffs argued that the parties intended that the benefits vest. Although the plaintiffs contended that the language of the agreements was unambiguous, the plaintiffs also offered extrinsic evidence to support their interpretation of the contract that the health benefits continued during their retirement. The plaintiffs provided three affidavits of union members who attended the negotiation sessions where the CBAs and insurance agreements were drafted. These affidavits state that the elimination of lifetime retiree health care benefits was not a subject discussed at any of the sessions. The plaintiffs also provided the affidavits of ten retired employees of the company who retired after 1988 and who had spoken with company agents about the benefits they would receive upon retirement. These affidavits state that the company agents conveyed the information that retirees were entitled to lifetime health care benefits.[6]
 
 
 8
 Defendants also argued that the language of the insurance agreements was unambiguous. Defendants, however, focused on the language of Section 1A of the agreement. Section 1A states that benefits are provided for the term of the agreement unless otherwise provided. Because Section 9C provided no durational time-frame the company argued that it was permitted to terminate benefits at the expiration of the agreement.
 
 
 9
 The plaintiffs filed a motion for summary judgment on the issue of whether the retirees' health care benefits had vested. In response to this motion and the plaintiffs' supporting affidavits, the defendants included affidavits from two company agents who were members of the negotiating team. Only one of these individuals, however, attended the negotiating sessions with the union. Both affidavits state that the language of the agreements does not provide for lifetime health care benefits for retirees. In addition, both affidavits state that although the affiants cannot remember the conversations set forth in the plaintiffs' affidavits, they do not believe they made the statements attributed to them.
 
 
 10
 The district court ruled in favor of the plaintiffs and granted their motion for summary judgment. Although the district court believed that the express language of the agreement supported plaintiffs' argument that lifetime retiree health care benefits had vested, the court also found that the extrinsic evidence supported the plaintiffs' interpretation of the agreement. The court stated that the affidavits of the negotiators confirmed the parties' intent and that the affidavits offered by the defendants contained "irrelevant legal Conclusions." In addition, the court noted that the retirees' affidavits showed that the company had assured them that they would receive lifetime benefits and that the defendants offered no contradictory evidence. Defendants appealed.
 
 II. Discussion
 
 11
 This court reviews a district court's entry of summary judgment de novo. See Sengpiel v. B. F. Goodrich Co., 156 F.3d 660, 664 (6th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, andadmissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Although defendants contend that summary judgment is appropriate only if the contract is unambiguous and clear, "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, No. 98-5860, 1999 U.S. App. LEXIS 18754, at *6 (6th Cir. Aug. 13, 1999) (citations omitted). The extrinsic evidence demonstrates that there is no genuine issue of material fact as to the parties' intent and the relevant provision becomes ambiguous only if read in conjunction with other provisions in the contract; thus, summary judgment is appropriate and the district court was correct in determining that the lifetime retiree health care benefits had vested.
 
 
 12
 This court in International Union v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1983), provided a framework for interpreting the provisions of a CBA. The Yard-Man court noted that whether benefits survive the termination of a CBA depends on the intent of the parties. 716 F.2d at 1479. To discern the intent of the parties, a court should apply the basic rules of contract interpretation.
 
 
 13
 For example, the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent.... The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. Id. (citations omitted).
 
 
 14
 In addition, the "terms must be construed so as to render none nugatory and avoid illusory promises." Id. at 1480. Finally, a court should consider extrinsic evidence only when the terms of the contract are ambiguous. See id.
 
 
 15
 Applying these rules of contract interpretation, the Yard-Man court stated that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference.... that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." Id. at 1482. The court acknowledged that the context in which collective bargaining agreements arise provides for a presumption that the parties intended for retiree benefits to vest. Although this inference does exist,
 
 
 16
 Yard-Man does not shift the burden of proof to the employer, nor does it require specific anti-vesting language before a court can find that the parties did not intend benefits to vest. Rather, the Yard-Man inference, and the other teachings of the opinion regarding contract interpretation and the consideration of extrinsic evidence, simply guide courts faced with the task of discerning the intent of the parties from vague or ambiguous CBAs. Golden v. Kelsey-Hayes Co., 73 F.3d 648, 656 (6th Cir. 1996).
 
 
 17
 The defendants argue that Yard-Man is not applicable to this case. To support their argument that the Yard-Man presumption should not apply, the defendants cite to Sengpiel. In Sengpiel, the court stated "[b]ecause vested benefits are forever unalterable, and because employers are not legally required to vest them, this Court recently held that 'the intent to vest [welfare benefits] "must be found in the plan documents and must be stated in clear and express language."'" 156 F.3d at 667 (quoting Sprague v. General Motors Corp., 133 F.3d 388, 400 (6th Cir 1998) (en banc) (quoting Wise v. El Paso Natural Gas Co., 986 F.2d 929, 937 (5th Cir. 1993))). Defendants contend that the CBA does not express a clear and affirmative intent to vest benefits, thus, the plaintiffs are entitled to no relief.
 
 
 18
 Sengpiel, however, is distinguishable from this case. In both Sengpiel and Sprague, the court was confronted with a benefit plan unilaterally instituted by the company. In this case, the benefit plan was negotiated between the company and the union. The Yard-Man presumption was specifically intended to apply in the context of a collective bargaining agreement. The Yard-Man court noted that "[b]enefits for retirees are only permissive not mandatory subjects of collective bargaining. As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." 716 F.2d at 1482 (citations omitted). Although the Yard-Man presumption is only an inference that the parties intended for benefits to vest, it is appropriate for the court to apply this presumption in this case.
 
 
 19
 This case also differs from Sengpiel and Sprague in that these CBAs, unlike the employers' plans in those cases, do not contain provisions reserving to the company the right to unilaterally modify or terminate the benefits contained in the agreement. The CBAs in this case, provide that the agreement will "continue in full force and effect without change" until the agreed upon expiration date. The agreements in both Sengpiel and Sprague contained a "reservation of rights" provision. This court has held that the inclusion of a "reservation of rights" provision establishes that there was no intent for benefits to vest. See eg., Sprague, 133 F.3d at 400 (noting that the court had rejected on numerous occasions the argument that ambiguity exists when the plan "entitles [participants] to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change"); Musto v. American Gen. Corp., 861 F.2d 897, 907 (6th Cir. 1988) (stating that the court in In re White Farm Equip. Co., 788 F.2d 1186 (6th Cir. 1986) "concluded that where the power to terminate such a welfare plan has been reserved, it may be exercised"). Because the unilateral nature of the benefits plan and the existence of the "reservation of rights" provision, significant factors influencing the court's decision in both Sengpiel and Sprague, do not exist in this case, this court is better guided by the Yard-Man decision.
 
 
 20
 The Yard-Man decision directs this court to consider the express language of the benefit provision. Section 9C provides that retirees shall have health care benefits "continued for themselves, their spouses, surviving spouses and eligible dependents." This court has found similar language in other agreements to evidence an intent to vest benefits. For example, in Helwig v. Kelsey-Hayes Co., 93 F.3d 243, 248 (6th Cir. 1996), this court determined that the language "[w]hen you are retired, your Health Care coverages, except for vision, are continued without cost to you," demonstrated an intent to vest benefits. See also Smith v. ABS Industries, Inc., 890 F.2d 841, 847 (6th Cir. 1989) (finding that the language "[b]enefits will continue for retirees" supported its decision that the retiree benefits had vested). The Helwig court also considered this provision, applicable to all employees who retired, in conjunction with a provision, applicable to employees who retired at age 65 or older, which contained the language, "will be continued for the rest of your life." 93 F.3d at 248. By reading the two provisions together, the court found that the parties intended for benefits to vest. The agreement in this case contains a similar provision. Section 9B identifies those employees who retired before July 1, 1988 and states that their benefits are "continued after retirement until their date of death." When Section 9C is considered in conjunction with 9B and interpreted in light of Helwig, Section 9C can be interpreted as vesting lifetime health care benefits. Indeed, to what other date than the death of the retiree or the spouse could the word "continue" apply? The district court found that the language of Section 9C was unambiguous and demonstrated the parties' intent to provide retirees and their dependents lifetime health care benefits.
 
 
 21
 Although the language of Section 9C is unambiguous, Yard-Man requires us to read each provision in light of the agreement as a whole. 716 F.2d at 1479. Section 9C becomes ambiguous when read in light of Section 1A. Because the district court considered Section 9B in interpreting Section 9C it would be improper not to examine the effect of Section 1A on the interpretation of Section 9C. Section 1A states that "[t]hese benefits will be provided at no cost to the Employees or retirees for the term of this Agreement except where the Plan specifically provides otherwise." Defendants argue that Section 9C does not provide a specific duration period; thus, Section 1A limits the benefits of Section 9C to the length of the agreement. A consideration of Section 9C in light of Section 1A requires this court to find that the language of this agreement is ambiguous.
 
 
 22
 When a contractual provision is ambiguous, the court may turn to extrinsic evidence to discern the intent of the parties. See ABS Industries, Inc., 890 F.2d at 846 n.1. The first item of extrinsic evidence that we consider is the insurance agreement associated with the 1985-1988 CBA. Plaintiffs contend that the changes between the 1985-1988 agreement and the 1988-1991 agreement were intended to increase the benefits made available to retirees. The 1988-1991 agreement increased the amount of paid-up life insurance by one thousand dollars. This agreement also extended health care benefits to retirees' spouses and dependents and increased coverage for all participants to include vision and hearing benefits. Plaintiffs argue that these changes would be illusory if they were to terminate upon the expiration of the agreement. Defendants respond that the imposition of a durational limitation on the benefits was a trade-off for these increased benefits. Further, the defendants suggest that the benefits were not illusory because the benefits could be continued indefinitely with the adoption of each new CBA.
 
 
 23
 The extrinsic evidence proffered by both parties supports the plaintiffs' argument that the increased benefits were not a tradeoff for non-vested benefits. When interpreting a collective bargaining agreement this court assumes that terms from previous collective bargaining agreements continue unchanged unless specifically renegotiated. Plaintiffs offer affidavits of three individuals who participated in the negotiating sessions between the company and the union. These three affidavits state that no Discussion about altering the duration of retiree health care benefits took place in these sessions. Defendants offer two affidavits which do not directly address this issue, but instead, set forth legal Conclusions as to the meaning of the relevant provisions. Defendants offer no evidence to contradict plaintiffs' affidavits; thus, there is no question of fact as to the absence of negotiations on this issue. Because plaintiffs' extrinsic evidence supports their interpretation of the relevant provisions of the agreement this court finds that the benefits vested. Indeed, it defies common sense that the union would give up vested benefits for retirees to get unvested benefits for the spouses of retirees.
 
 
 24
 In addition to the affidavits of the negotiators, plaintiffs offer affidavits of retirees to support the company's interpretation of the agreement conveyed to them. These affidavits state that company agents informed retirees that their health care benefits would be lifetime benefits. Defendants proffer the affidavits of the two agents in which they state that although they do not remember the particular conversation, they believe they did not make these statements. The district court found that because the defendants' affidavits did not contradict the plaintiffs' affidavits there was no issue of fact to be resolved. The district court stated that the plaintiffs' affidavits bolstered their contention that lifetime retirees' benefits had vested.
 
 
 25
 This court has held that a contract cannot be altered by representations of company agents. See Sprague, 133 F.3d at 402-03. Yet, the district court did not err in finding that these statements supported the plaintiffs' interpretations of the relevantprovisions. If the provisions had unambiguously stated that the benefits did not vest, then this court could not find that verbal agreements modified the plan. This court can consider oral statements, however, when the language of the plan is ambiguous. Although these affidavits alone may not have been sufficient to demonstrate the parties' intent, the affidavits, in conjunction with the other extrinsic evidence, provide further support for the district court's interpretation of the agreement.
 
 
 26
 Although the language of Section 9C of the CBA appears unambiguous, it becomes ambiguous when read in light of Section 1A. Applying principles of contract interpretation, it is appropriate to consider extrinsic evidence to discern the intent of the parties when the contract language is ambiguous. Because the district court was correct in finding that the extrinsic evidence proffered by the plaintiffs was persuasive this court affirms the district court's granting of summary judgment in favor of the plaintiff.
 
 III. Conclusion
 
 27
 For the foregoing reasons, this court affirms the judgment of the district court.
 
 
 
 NOTES:
 
 
 [1]
 This appeal concerns three different Collective Bargaining Agreements: (1) the 1988-91 agreement; (2) the 1991-1994 agreement; and (3) the 1994-1997 agreement. Because the relevant provisions are identical in all three agreements they will be referred to collectively as the CBAs.
 
 
 [2]
 Defendants conceded, in the district court, that the life insurance benefits vested and that they are obligated to provide retirees with a paid-up life insurance policy for $3,500.
 
 
 [3]
 The length of each CBA and accompanying insurance agreement was three years.
 
 
 [4]
 Defendants BVR and Unitron are referred to collectively as "the company." Unitron operated the business prior to May 31, 1994, when it sold the business to Beaver Precision Parts. On April 7, 1997, Beaver Precision Parts sold essentially all its assets and changed its name to BVR Liquidating, Inc.
 
 
 [5]
 The 1988-1991 agreement provides in relevant part:
 Section 9
 Coverage for Retired Employees
 9A. Employees Who Retired Before June 1, 1985 Through June 30, 1988
 Employees who retired before June 1, 1985 and prior to July 1, 1988 shall have group insurance coverage continued in accordance with the applicable agreements in effect at the time of their retirement.
 9B. Employees who Retire On or After June 1, 1985
 Employees who retire on or after June 1, 1985 shall have paid-up life insurance in the amount of $2,500 and shall have the hospital-surgical-medical (excluding hearing and vision) and prescription drug coverages set forth in Section 6 of this Insurance Agreement continued after retirement until their date of death. All other group insurance coverages shall be terminated as of the date or retirement.
 9C. Employees who Retire On or After July 1, 1988
 Employees who retire on or after July 1, 1988 shall have paid-up life insurance in the amount of $3,500 and shall have the hospital-surgical-medical, vision, prescription drug, and hearing coverages (excluding dental) as set forth in Section 6 of this Insurance Agreement continued for themselves, their spouses, surviving spouses and eligible dependents.
 9D. Surviving Spouses of Active or Retired Employees
 If an Employee who retires after June 4, 1988 dies during the term of this Agreement, such Employee's Surviving Spouse and Eligible Dependents shall have their hospital-surgical-medical, prescription drug, hearing and vision coverages (excluding dental) continued for them at Company expense.
 If an active Employee dies during the term of this Agreement, such Employee's surviving spouse and eligible dependents shall have their hospital-surgical-medical, prescription [drug], hearing, and vision coverage (excluding dental) continued for them, at Company expense, for sixty (60) days from the Employee's date of death.
 
 
 [6]
 The plaintiffs also offered the affidavit of the wife of one of the employees. She states that she attended a meeting with her husband and a company agent where the agent stated that retiree health care benefits were for life.